lml

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| RALPH STEVENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 06-2265-JAR |
| | ) | |
| WATER DISTRICT ONE OF | ) | |
| JOHNSON COUNTY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Plaintiff Ralph Stevens alleges that defendant Water District One of Johnson County ("WaterOne"), discriminated against him based on his age in violation of the Age Discrimination in Employment Act ("ADEA"), and hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 24 U.S.C. § 2000e *et seq.* This matter comes before the Court on WaterOne's Motion for Summary Judgment (Doc. 19) and plaintiff's Motion to Strike and Compel Documents (Doc. 30). For the reasons explained in detail below, the Court denies plaintiff's motion to strike, grants defendant's motion for summary judgment with respect to the ADEA[1] and hostile work environment claims and denies defendant's motion with respect to the retaliation claim.

## I.     Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no

---

[1]In his response (Doc. 23), plaintiff does not address and thus abandons his claim of age discrimination.

genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[2] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must

---

[2]Fed. R. Civ. P. 56(c).

[3]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[6]*Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671).

[8]*Anderson*, 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[9]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

"set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[11]  Rule 56(e) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[12]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[13]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15]

## II.     Motion to Strike

Before discussing the uncontroverted facts in this case, the Court addresses plaintiff's objections to certain affidavits that WaterOne submitted as attachments in support of its summary judgment motion.  Plaintiff originally challenged certain affidavits on the basis that

---

[10]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[11]*Adams*, 233 F.3d at 1246.

[12]Fed. R. Civ. P. 56(e).

[13]*Id.*; *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[14]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

3

they lack personal knowledge or contain hearsay information in violation of D. Kan. R. 56.1. and Fed. R. Civ. P. 56(e).   In its reply brief, WaterOne asserts that the affidavits are proper, based on personal knowledge and created in good faith.  Nevertheless, WaterOne submitted supplemental affidavits that "remedy any potential defects raised by plaintiff."  These supplemental affidavits were provided for Paul Smith, Chuck Weber, Larry Meacham, Eric Arner, Mike Armstrong and Tom Schempp and original affidavits from Kevin Yoder, Travis Detherage, and Ed Kriebs. WaterOne also attached new exhibits and included additional information in some of the affidavits.

Plaintiff argues that all of the reply affidavits and exhibits should be stricken because they improperly offer "new argument" to support WaterOne's motion for summary judgment. Plaintiff does not object to the content or admissibility of the exhibits, but rather, objects that they are being submitted for the first time in WaterOne's reply.  Plaintiff also asks the Court to compel WaterOne to produce all the documents it has "concealed" throughout the course of this litigation.  Defendant responds that the affidavits attached to its reply are supplemental affidavits, permitted by Fed. R. Civ. P. 56(e) and that the evidence is offered as rebuttal to plaintiff's arguments.

Fed. R. Evid. 602 requires that a testifying witness "ha[ve] personal knowledge of the matter" testified to."  Rule 56(e) states, in pertinent part: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  The Tenth Circuit has stated that "under the personal knowledge standard, an affidavit is inadmissible if the witness could not have actually perceived or observed that which he

4

testifies to."[16]  Statements of "mere belief in an affidavit must be disregarded."[17]  Rule 56(e) also

requires that "copies of all papers or parts thereof referred to in an affidavit be attached thereto

or served therewith."  To enforce this rule, the court ordinarily does not strike affidavits, but

simply disregards those portions that are not shown to be based upon personal knowledge or

otherwise do not comply with Rule 56(e).[18]

Local Rule 56.1 states: "In a reply brief, the moving party shall respond to the non-

moving party's statement of undisputed material facts in the manner prescribed in subsection

(b)(1)."  Subsection (b)(1) states:

> A memorandum in opposition to a motion for summary judgment
> shall begin with a section that contains a concise statement of
> material facts as to which the party contends a genuine issue exists.
> Each fact in dispute shall be numbered by paragraph, shall refer
> with particularity to those portions of the record upon which the
> opposing party relies, and if applicable, shall state the number of
> movant's fact that is disputed.

Plaintiff appears to argue that Rule 56.1 allows a party filing a reply to respond to facts

presented by the adverse party but does not allow the party to set forth additional facts.  Plaintiff

asserts that the supplemental affidavits set forth additional new arguments and evidence and

therefore violate the local rule.  WaterOne responds that the supplemental affidavits are proper

and permitted by Fed. R. Civ. P. 56(e), which states, in pertinent part: "The court may permit

affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further

---

[16]*Argo v. Blue Cross and Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (internal quotations and citations omitted).

[17]*Id.* (quotation omitted).

[18]*Litton v. Maverick Paper Co.*, 388 F. Supp. 2d 1261, 1268 (D. Kan. 2005) (citing *Maverick Paper Co. v. Omaha Paper Co.,*18 F. Supp. 2d 1232, 1234-35 (D. Kan. 1998)).

affidavits."  The Tenth Circuit has stated that a district court "clearly has discretion to permit supplemental affidavits it finds useful for summary judgment determination," such as information the court finds relevant and admissible as evidence.[19]

Plaintiff also argues that WaterOne for the first time raises new issues and arguments in its reply.  Plaintiff correctly states that as a general rule, a party is prohibited from raising new arguments in a reply brief.[20]  Plaintiff, however, does not identify these allegely "new" issues or arguments offered by WaterOne in support of summary judgment.  In its initial brief, WaterOne asserted that plaintiff's retaliation claim must fail because he could not make a prima facie case of hostile work environment and could not show that WaterOne's stated reasons for termination were pretextual.  In his response brief, plaintiff contends that the alleged harassment was severe and pervasive and contradicts and denies WaterOne's version of the facts leading up to his termination, in particular with respect to the Missouri River turbidity issue.  The essence of plaintiff's opposition is to flat out deny the statements in Meacham's original affidavit, going so far as to accuse him and others of lying and fabrication.  In its reply, WaterOne does not deviate from its original arguments on hostile work environment and retaliation. Thus, instead of new arguments,  the situation before the Court involves the use of additional evidence to support argument previously advanced.

"Where the reply affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for the entry of summary

---

[19]*Lighton v. Univ. of Utah*, 209 F.3d 1213, 1227 (10th Cir. 2000).

[20]*See, e.g.*, *United States v. Murray*, 82 F.3d 361, 363 n.3 (10th Cir. 1996).

judgment, reply papers—both briefs and affidavits—may properly address those issues."[21]  "[I]f the court relies on new materials or argument in a reply brief, it may not forbid the nonmovant from responding to these new materials."[22]  This rule applies to new materials submitted in support of a legal argument that has already been made.[23]  Plaintiff does not move for leave to file a surreply, instead opting to move to strike all new or supplemental submissions.  By considering plaintiff's instant motion to strike, the Court has permitted plaintiff to respond to the supplemental affidavits and new evidence.[24]

The Court will address each affidavit in turn.

**A.    Ed Kriebs, Travis Detherage and Kevin Yoder Affidavits:**  In response to plaintiff's assertion that Meacham fabricated the events leading up to plaintiff's termination, WaterOne submits on reply the original affidavits of Kriebs and Detherage, Tech employees who worked with plaintiff.  Both affidavits support the statements in Meacham's original affidavit regarding the Missouri River turbidity issue.  WaterOne also submits emails dated October 3 and 4, 2005, from Detherage to Meacham and Weber regarding his data compilation and review.[25]  WaterOne also submits an affidavit from Kevin Yoder averring that he was the lawyer who conducted the investigation of plaintiff's claim of harassment.  The Court finds these affidavits and exhibits to be useful and relevant to its summary judgment termination and thus denies

---

[21]*Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1120, 1134 (7th Cir. 1996) (quotation omitted).

[22]*Daneshvar v. Graphic Tech., Inc.*, 237 F. App'x 309, 318 (10th Cir. 2007) (citing *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998)).

[23]*Id.* (citing *Doebele v. Sprint Corp.*, 342 F.3d 1117, 1139 n.13 (10th Cir. 2003)).

[24]*Id.* (contrasting situation where party raises new or alternative argument in its reply).

[25]The October 4, 2005 email was also attached as Ex. S to WaterOne's original memorandum (Doc. 20).

7

plaintiff's motion to strike.

**B.     Eric Arner Affidavit and Supplemental Affidavit:** Plaintiff contends that

Arner's affidavit is based on hearsay and that he has no firsthand knowledge of the facts.  Arner,

the General Counsel for WaterOne, states that WaterOne retained the law firm of Speer &

Holliday to investigate plaintff's complaint against Meacham.  Arner's affidavit sets forth the

findings of Kevin Yoder, the attorney at Speer & Holliday who conducted the investigation and

prepared an Investigative Report.  WaterOne also attaches the Investigative Report as an exhibit

to its motion.  Certainly, Arner can attest to these facts, which does not constitute hearsay as it is

not offered to prove the truth of the matter asserted.[26]  Personal knowledge of the subject matter

attested to can be inferred based on Arner's position with WaterOne.

Arner's supplemental affidavit specifically states that he has personal knowledge of the

facts contained in the supplemental as well as original affidavit.  Arner also responds to Bill

Ducket's affidavit attached to plaintiff's response to WaterOne's motion for summary judgment,

in which he alleges that Meacham engaged in inappropriate conduct of a sexual nature.  The

Court finds that Arner's supplemental affidavit responds directly to issues raised by plaintiff

regarding the validity of the original affidavit.  It also responds to facts presented by plaintiff.

Plaintiff's motion to strike Arner's affidavits is denied.

**C.     Paul Smith Affidavit and Supplemental Affidavit:** Paul Smith is the Assistant

Superintendent of Operations Treatment and Process for WaterOne.  WaterOne provided a

---

[26]Fed. R. Evid. 801(c).

supplemental affidavit from Smith based on plaintiff's objections to paragraphs 2 and 4 of his original affidavit asserting that Smith lacked personal knowledge as to events surrounding the mobile computing device policy.  The supplemental affidavit responds directly to issues raised by plaintiff regarding the validity of the original affidavit.  Plaintiff also objects to the supplemental exhibits related to Smith's affidavit, the emails regarding the mobile computing device policy referenced in the supplemental affidavit.  The Court is at a loss as to why plaintiff brings this objection, given that he admits all of WaterOne's factual contentions relating to the mobile computing device policy, which were based on Smith's original affidavit.[27]  Plaintiff's motion to strike Smith's affidavits is denied.

**D.      Larry Meacham Affidavit and Supplemental Affidavit:**  Larry Meacham is the Operations Team Leader for WaterOne.  Plaintiff objects to paragraph 11 of Meacham's original affidavit that states that on August 22, 2005, plaintiff contacted Kriebs in the control room to obtain a SCADA intake turbidity reading, which Kriebs found strange.  Meacham has supplemented his affidavit by stating he has personal knowledge of the facts therein and that Kriebs reported to Meacham that plaintiff had contacted Kriebs and that he found plaintiff's phone call strange.  The Court denies plaintiff's objection to and motion to strike paragraph 11.

Plaintiff also objects to paragraph 15, which states what plaintiff reported to Travis Detherage on October 3, 2005.  Meacham states in that paragraph that Detherage reported his findings to Meacham and Chuck Weber.  Meacham has supplemented his affidavit by stating that he has personal knowledge of the facts and that Detherage had sent him and Weber emails

---

[27]*See* Doc. 23 at ¶¶ 32-34.

detailing the data and summarizing his discussions with plaintiff and setting forth the details of those emails.  Those emails are offered as new exhibits along with the affidavits of Detherage. The Court denies plaintiff's objection to and motion to strike this paragraph.

Finally, plaintiff objects to paragraph 16 of Meacham's original affidavit, which states that the data logs indicated that plaintiff had not performed any analyzer checks since June 6, 2005 and that prior to that date, the data logs showed that plaintiff had checked them on a regular basis.  This paragraph also references plaintiff's training.  Meacham supplements his affidavit by stating he has personal knowledge of the facts and that on July 29, 2005, he sent Weber and Smith an email requesting plaintiff's card key computer data to ascertain whether plaintiff was at the Missouri Intake on July 28, 2005, as well as the previous six months, and apprised Weber and Smith of his concerns leading up to his email.  WaterOne also submits the three emails referenced by Meacham in his supplemental affidavit dated July 29, August 16, and August 22, 2005.  The Court finds that this evidence does not constitute a new argument but rather, is offered in reply to plaintiff's response to Meacham's version of the facts leading up to his termination, in particular with respect to the Missouri River turbidity issue.  The essence of plaintiff's opposition is to flat out deny the statements in Meacham's original affidavit, going so far as to accuse him of lying and fabrication.  While it certainly would have alleviated any confusion and argument had this documentation simply been submitted in the first place, this new evidence in the form of emails is submitted merely to show that Meacham documented the incidents, and the Court finds it useful and relevant to summary judgment.

**E.    Chuck Weber Affidavit and Supplemental Affidavit:** Weber is Superintendent of Operations for WaterOne.  Weber summarizes the results of the review of

plaintiff's card reader access log and how many times he checked the Missouri River turbidity meter.  No documents regarding the card reader access log were submitted along with Weber's affidavit.  Plaintiff challenged Weber's personal knowledge as to various events described in Weber's original affidavit and denied that the Missouri River incident occurred or that he failed to perform his assigned job duties.  Weber supplemented his affidavit by stating that he has personal knowledge of the facts contained in the supplemental and original affidavit.  In response to plaintiff's assertion that he did not work on Mondays and Thursdays, Weber states that the card reader access log revealed that plaintiff did work on those days prior to August 22, 2005.  Plaintiff claims that this documentation, which is not before the Court, was not provided in discovery, which WaterOne denies.  Since WaterOne has not submitted the card reader documents to either its original or reply memorandum, the Court will disregard this portion of Weber's affidavits as well as any reference in its arguments. [28]  The Court notes, however, that plaintiff admits WaterOne's statement of fact that the card reader access log revealed that before July 28, 2005, the last time plaintiff was at the Missouri River Intake was on June 16, 2005.[29]

     **F.**    **Tom Schrempp Affidavit and Supplemental Affidavit:**  Shrempp, the Director of Production for WaterOne, stated in his original affidavit that on October 10, 2005, he recommended plaintiff's termination to Tom Holmes, Director of Human Resources for WaterOne, based on three incidents that occurred prior to August 23, 2005, and one that occurred after.  Plaintiff objected on the grounds that Schrempp does not state that these were the

---

[28] *See* Fed. R. Civ. P. 56(e) (requiring that "copies of all papers or parts thereof referred to in an affidavit be attached thereto or served therewith.").

[29] (Doc. 23 ¶ 48.)

only reasons for termination and that the affidavit is not based on personal knowledge.

Schrempp supplemented his affidavit by stating he has personal knowledge of the facts in the

supplemental and original affidavit, and provides further explanation on the date stamps on the

memorandum.  WaterOne also submits as new evidence a memorandum from Shrempp to

Armstrong dated November 10, 2005, further detailing and explaining his recommendation that

plaintiff be terminated.  This memorandum was not provided to plaintiff in discovery and

WaterOne has agreed to withdraw this document as an exhibit from its reply.[30]  The Court will

disregard the November 10, 2005 memorandum and any reference to it in WaterOne's argument

in its reply memorandum.  Plaintiff's motion to strike is otherwise denied.

> **G.**     **Mike Armstrong Affidavit and Supplemental Affidavit:** Armstrong, the

General Manager for Water One, stated in his original affidavit that WaterOne is a quasi-

municipal agency and that it provides periodic in-house training for all employees on workplace

harassment.  Although plaintff does not specifically object to Armstrong's affidavit, Armstrong

supplemented it by stating that he has personal knowledge of the facts contained in the

supplemental and original affidavit, and adds that he made the ultimate decision to terminate

plaintiff's employment.  The Court finds this supplemental affidavit proper and denies plaintiff's

motion to strike.

## III.     Statement of Material Facts

---

[30]The memorandum also states that Holmes indicated that if he, Weber and Randy Porter could not agree on plaintiff's termination, they each needed to write memos to the General Manager.  Although Holmes' November 14, 2005 memo to Armstrong is submitted as part of the record (Doc. 20, Ex. T), there is no evidence of any subsequent memos from Weber or Holmes.  Plaintiff requests the Court to compel these and any other documents that WaterOne has not produced.  WaterOne responds that it has reviewed its documents relating to plaintiff, that it has produced all of the relevant and responsive documents in this case, and apologizes for its unintentional oversight regarding the November 10, 2005 memorandum.  The Court thus denies plaintiff's motion to compel at this time, without prejudice to raise the issue again before trial.

The following facts are taken in the light most favorable to plaintiff. Plaintiff is a fifty-eight year old male. WaterOne is a quasi-municipal agency that provides water to more than 400,000 individuals in Johnson County, Kansas. Plaintiff began working for WaterOne as an assistant operator in 1977. As an assistant operator, his job duties included collecting samples, creating chemical batches and cleanup. In or around 1983, WaterOne promoted plaintiff to the position of operator. In this position, plaintiff was responsible for water quality and his duties consisted primarily of adjusting machinery and maintaining parameters established by the lab supervisors.

In approximately 1992 or 1993, WaterOne converted to a Tech system, and plaintiff as well as all other operators became a Tech II. Rick Haney started as plaintiff's supervisor and team leader, and Mike Henderson, William Duckett and Steve McGee were his team members. Larry Meacham subsequently replaced Haney as plaintiff's supervisor and team leader. Under Meacham's supervision, plaintiff's job duties continued to include maintaining water quality, but additional tests were added and plaintiff was required to work in the control room where the water quality was controlled by the computer system. In December 2000, plaintiff was promoted to Tech III. Plaintiff received a promotion to Tech IV in July 2002.

*Hostile Work Environment*

On August 23, 2005, plaintiff reported sexual harassment to Tom Holmes, Director of Human Resources. Plaintiff's complaint consisted of three comments made by Meacham. While plaintiff contends that the overall treatment by Meacham was hostile, he does not give any examples other than the three specific incidents described as follows. The first incident occurred on February 15, 2005, when Meacham told plaintiff that he might catch the new janitor "butt

13

f***ing" plaintiff on the floor.  Plaintiff responded by saying, "well, there won't be any days like

that."  The second incident occurred on March 30, 2005, when Meacham told plaintiff that

Meacham and another supervisor, Ramsey Hagen, could not get married due to the Marriage

Amendment to the Kansas Constitution.  Plaintiff was unable to recall what he and Meacham

were discussing when the comment was made.  The third incident occurred on April 11, 2005,

when Meacham commented that he had sex at every job except at WaterOne and that he almost

had sex at the 211th Street station.  Again, plaintiff was unable to recall what he and Meacham

were discussing when the comment was made.  Plaintiff documented these incidents in a

handwritten log, but did not report any of these comments to Meacham's supervisor, the

Superintendent of Operations or Director of Operations, until he made the claim to Holmes on

August 23, 2005.

On or about August 25, 2005, WaterOne retained the law firm of Speer & Holliday, LLP,

to investigate plaintiff's complaint.  During the investigation, WaterOne transferred Meacham to

a different shift from plaintiff.  On August 25, 2005, Kevin Yoder, an attorney at Speer &

Holliday, interviewed plaintiff, who told him that Meacham was known for making

inappropriate comments, that he has heard them in the past, but did not start recording them until

this year.  When pressed for specific examples, plaintiff could not provide any beyond the three

incidents that were part of his complaint.  Plaintiff told Yoder that in the first incident, he and

Mike Henderson were discussing professional wrestling and that Meacham informed plaintiff

that if plaintiff fought a wrestler, he would be knocked out with the janitor taking sexual liberties

with him.  Plaintiff told Yoder his response was, "That'll never happen."

Yoder interviewed Meacham, who denied making any homosexual comments and

14

specifically denied the February 15, 2005 comment about "sexual liberties" with the janitor; admitted making the marriage comment about Hagen on March 30, 2005; and admitted telling stories about having sex on the job and about his date at the 211th Street station. During his interview, Meacham advised Yoder that plaintiff liked to tell off-color "bar jokes" and that he believed plaintiff was upset with him for having filed a complaint against plaintiff for failing to perform his job responsibilities at the Missouri river.

Yoder also interviewed Mike Henderson, William Duckett, Jim Knapp and Kriebs. Henderson was the only one who reported hearing Meacham's comment to plaintiff about the janitor. Henderson asserted that Meacham was known for making inappropriate comments, but when pressed for examples, was unable to provide any other than the February 15, 2005 comment about the janitor. Duckett told Yoder he thought Meacham was "loose, immature and lewd" with his comments. Duckett did not know anything about the specific comments alleged by plaintiff, but believed they were comments Meacham would make. Kriebs told Yoder that plaintiff's behavior was inappropriate, including telling off-color jokes, some sexual in nature. Both Kriebs and Knapp told Yoder they had never heard any homosexual comments made by Meacham.

On September 4, 2005, Yoder issued an investigative report to WaterOne. Yoder concluded that "[he did] not find any evidence of any innuendo or quid pro quo or other forms of sexual harassment other than occasional off color jokes, inappropriate stories or comments being made." Yoder found that Meacham's comment about the janitor, which was plausible despite his denial, was made in an effort to fit in with the rest of the work crew and gain their respect, and there was no evidence that it was more than an off-hand comment made in poor taste. Yoder

reported that Meacham admitted making the second and third comments.

On September 7, 2005, Holmes met with plaintiff and provided him with the results of the investigation.  Holmes reported the investigation revealed inappropriate employee comments, but that they did not rise to the level of a hostile work environment.  Holmes reported that plaintiff seemed surprised that WaterOne was not going to discipline Meacham for his comments or actions and plaintiff asked "what it takes to fire someone here for their actions, like what [Meacham] said to him."  Holmes explained that the investigation process was confidential and told plaintiff that he should contact Holmes if he thought he was being retaliated against for making his complaint.

Holmes also met with Meacham and provided him with the results of the investigation.  When Holmes explained the details of the findings, Meacham "chuckled/smiled."  Holmes stated he was not sure if this reaction was due to relief, nervous energy or something else, and that he was surprised by it.  Holmes explained to Meacham that as a supervisor, he is held to a higher standard and cannot participate in the "horseplay bull sessions" that occur on the shift.  Holmes referred him to the Sexual Harassment Policy and told Meacham that he was not to retaliate against plaintiff or use anything said in the investigation against anyone.

Finally, Holmes covered the investigation with the others who were interviewed. Henderson seemed surprised that Meacham was coming back to his shift and expressed concern that he would "have it out for him."  Duckett expressed that he was mad during the interview because he had been disciplined for an unrelated issue.  Kriebs thanked Holmes for the update.

Holmes also met with Schrempp, Weber and Smith to cover his meeting with the employees.  Holmes stated that these three appeared to be uncertain about the process, and gave

them a summary of plaintiff's three charges.  There were no comments about the first charge, but

the second and third charges drew chuckles until Holmes told them that Meacham admitted to

the incidents.

*Policy on Sexual Harassment and Retaliation*

WaterOne has a formal policy prohibiting sexual harassment that details the procedure

for reporting alleged sexual harassment and prohibits retaliation against employees for making

complaints.  The harassment policy states the following:

> Water District No. 1 of Johnson County is committed to providing
> a professional work environment that maintains employee equality,
> dignity, and respect.  In keeping with this commitment, the Water
> District strictly prohibits discriminatory practices, including sexual
> harassment and harassment based on race, religion, national origin,
> gender, sexual preference, age or disability.  Any harassment,
> whether verbal, physical or environmental, is unacceptable and
> will not be tolerated, whether it occurs in the workplace, at outside
> work-sponsored activities or in the field.

The harassment policy provides that violators will be subject to disciplinary action, up to and

including termination of employment.  WaterOne also provides periodic mandatory in-house

training for all employees on workplace harassment.

*Policy on Discipline*

WaterOne's general discipline policy, Section 5.2, states, in relevant part,

> As a general rule, the disciplinary action should be progressive
> from the least to most severe, depending on the violation.  A
> serious infraction may, however, warrant immediate suspension or
> dismissal in the first incident.
>
> There are three primary types of discipline: reprimands,
> suspensions and dismissal.  Prior to the discipline process,
> counseling could be appropriate.  Counseling should be viewed as

a positive form of discipline.

The policy sets forth a schedule of progressive discipline, and states, "It is the explicit intention of [WaterOne] for discipline to be administered fairly, on a timely basis and without prejudice."  Guidelines for possible progressive disciplinary action are 1) verbal reprimand given for minor violations; 2) written reprimand given in cases where verbal reprimand has not proven corrective; and 3) suspension without pay or termination given for violations of a "serious nature."  The policy states that "Dismissal may be made for inefficiency, insubordination, habitual absenteeism, job related criminal conviction or similar cause (not limited to these reasons stated above.)"  The policy states that "[a]ny separation request will require the General Manager's approval with prior discussion with the Director of Human Resources."

WaterOne's policy for discipline resulting from safely manual violations, Section 5.3, provides in relevant part,

> A Safety Citation is a disciplinary device to alert the employee that an avoidable infraction of the safety rules has occurred.  Normally, it is given on the second, third, or fourth offenses; occasionally it can be given on the first offense if the seriousness of the infraction so warrants.

WaterOne also follows a progressive safety disciplinary process: 1) first offense results in Safety Violation Warning; 2) second offense results in Safety Citation; 3) third offense results in discipline; and 4) fourth offense in any three year period results in termination.

*Mobile Computing Device Policy*

On June 21, 2005, Meacham held a team meeting and distributed a new mobile computing device policy.  After discussing the policy, Meacham directed each team member to

execute and return the form to him.  Plaintiff did not execute the form and advised that his

attorney first had to review and approve the form.  Five weeks later, on July 27, 2005, Smith

followed up with plaintiff and requested that he provide an explanation for his failure to execute

the form.  Smith advised plaintiff that his work would be impacted if he did not execute the

form.  The next day, plaintiff returned the executed mobile computing device form and remarked

that he had not refused to execute the form but rather, he was too busy on June 21, 2005, and

therefore was unable to review the form.

*Missouri River Turbidity Issue*

Meacham asserts that at a shift meeting in late March 2005, he assigned plaintiff the task

of handling the Missouri River on Mondays and Thursdays.  Specifically, plaintiff was to go to

the Missouri Intake to check the Missouri Raw River turbidity meter ("turbidity meter").

Meacham testified that after the meeting, he assumed plaintiff was going to the Missouri River

Intake to check and clean the turbidity meter and whenever he questioned him about it, plaintiff

responded by saying that it was a little muddy and that he had cleaned it.

On July 29, 2005, Meacham sent Weber and Smith an email with the subject matter

"Some doubts about Ralph Stevens."  Meacham relayed that "awhile back" he structured his

shift schedule so that plaintiff was responsible for the Missouri River oversight on Mondays and

Thursdays.  Meacham goes on to state that "a few weeks ago" he found the turbidity meter

clogged with mud and filled with ants.  When he questioned plaintiff about the turbidity meter,

plaintiff told him that he had missed cleaning it out the week before.  Meacham stated that he

then held a shift meeting where he showed photos of the clogged turbidity meter and stressed to

plaintiff the importance of keeping the meter clean.  Meacham states in the email that on July 28,

19

2005, Kriebs ran the Missouri Settled River turbidity and found it to be higher than usual. Plaintiff checked the turbidity reading on the Supervisory Control and Data Acquisition system ("SCADA") and also found it to be high.  Meacham told plaintiff to check the raw turbidity meter to see if it was reading correctly or was mudded up.  Plaintiff said he would run the turbidities by hand and called Meacham from the river with his result, which was higher than the earlier number read off SCADA.  When he returned, Meacham asked plaintiff if the raw turbidity meter was mudded up and plaintiff responded that it was "pretty clean," but was reading lower than his hand sample.  Meacham then stated that he was suspicious that plaintiff may not have gone to the river and checked the raw turbidity meter as he said.  Meacham was also suspicious that when plaintiff went to the Missouri River on Mondays and Thursdays, he was not checking and cleaning the raw turbidity meter as previously instructed.  Meacham requested computer records of plaintiff's card key records to ascertain how many times plaintiff had been to the Missouri Intake on July 28, 2005, as well as the past six months.  Meacham documented his concerns in a Report dated August 16, 2005.

On August 22, 2005, Schrempp and Weber met with plaintiff.  Weber states that in that meeting, plaintiff initially reported that he had been performing his assigned job duties and specifically checking the turbidity meter at the Missouri Intake on Mondays and Thursdays. After apprizing plaintiff that they did not believe he was being truthful about his turbidity meter checks, Weber states that plaintiff revised his story and stated that if his presedimentation check showed a low turbidity number, he would not check the Missouri Intake turbidity meter.  Weber states that according to plaintiff, he would call the control room and get a SCADA intake turbidity reading and if the SCADA reading was close to his check at the presedimentation

facilities, he would not check the turbidity meter.

On this same date, plaintiff, who was at the Missouri River, contacted Kriebs in the control room to obtain a SCADA intake turbidity reading.  Kriebs reported the incident to Meacham and told him he thought plaintiff's call was "odd" because plaintiff had never asked for this information before.  Meacham then sent an email relaying this to Weber and Smith, adding that Meacham had never received a call from plaintiff asking to confirm the turbidity reading with the SCADA intake turbidity reading.

Plaintiff testified that he was first told about checking the turbidity meter every time he goes to Missouri on August 22, 2005, the date of the meeting with Schrempp and Weber. Plaintiff admits that the card reader access log revealed that before July 28, 2005, the last time he was at the Missouri River Intake was on June 16, 2005.  He further testified that it was his understanding that other employees were to check the turbidity meter when they visited the Missouri Intake and that it was not solely his responsibility.  Plaintiff testified that he checked the turbidity meter frequently, but on several occasions, he could not check it because a train was blocking his access.  On those occasions, he would call Meacham and he would tell plaintiff not to worry about it.  Plaintiff also testified that he did not check the turbidity meter if he "was real busy up above, and didn't have time to do it."  Plaintiff testified that if there was a problem with the analyzer, it would show up in the control room, and unless he was notified by the control room that there was a problem and he was busy, he did not check.  When he was told on August 22, 2005 that he was not cleaning the turbidity meter, he testified that he said, "Fine. . . . if that's my job, I'm supposed to do that now by myself, I'm the only one during the week, fine I'll do it. And I did.  I cleaned up what they asked me to do.  I was checking the analyzer every time after

that." Plaintiff denies that Meacham questioned him about the clogged turbidity meter in July of

2005, going so far as to accuse him of lying. He also denies Weber's claim that plaintiff

changed his story during the August 22, 2005 meeting, and accuses him of lying as well.

*Plaintiff's Log on Kriebs*

On or about July 21, 2005, plaintiff advised Meacham that he was keeping a "secret"

attendance log on Kriebs. According to plaintiff, Kriebs had not been employed long enough to

take paid days off, and therefore, was cheating WaterOne. Plaintiff initially refused to provide

Weber his log on Kriebs. Weber found plaintiff's conduct to be unprofessional, insubordinate

and subversive. After Weber's continued requests, plaintiff provided the log to Weber and

Schrempp on August 22, 2005. Weber conducted an investigation into Krieb's attendance and

concluded that plaintiff's accusations were unfounded and false and consequently concluded that

Kriebs had not engaged in any wrongful conduct.

*Post-August 23, 2005*

Upon receipt of plaintiff's complaint of harassment on August 23, 2005, Weber

suspended further investigation of plaintiff's behavioral and performance issues. On September

28, 2005, Weber concluded his investigation and recommended to Holmes that plaintiff be

terminated based on three incidents: 1) plaintiff's refusal to sign WaterOne's mobile computing

device policy; 2) plaintiff's refusal to provide information that he was secretly keeping on other

employees related to presumed falsification of timesheets; and 3) plaintiff's repeated failure to

check the turbidity meter at the Missouri River Intake. After describing the particulars of each

incident, Weber recommended termination because "[t]he severity of the insubordination, lies,

and dereliction of duty [left him] with no confidence in [plaintiff's] ability to operate a water

treatment plant."  Weber states that it is his belief that plaintiff filed the complaint against Meacham in order to save his job.

On October 3, 2005, plaintiff checked the chemical analyzers and Meacham was operating the plant.  Because the water quality in Primary Basin No. 7 was off and not responding to treatments, Meacham checked the chemical analyzers and discovered that none of the analyzer discharge lines had any flow coming out of them.  Upon checking the turbidity cabinet, Meacham discovered that the turbidity cover was not secured properly, the turbidity meter was dry, the Anachem[31] was in stop mode and had an alarm warning on the screen, and the turbidity meter's cells were filled with unflushed chemicals.  Meacham spent several hours fixing the problem, then sent an email to Weber and Smith reporting the incident.

That same day, Detherage states that after some initial problems reading the display on the Anachem, plaintiff informed him that he did not need any assistance with the Anachem. When Detherage later asked plaintiff about the Anachem after he completed the onsite verifications, plaintiff reported that it appeared fine and the flow was satisfactory.  Detherage later discovered that plaintiff had not synchronized the database and that the database contained fragmented comparison data only.  Detherage further discovered that the Anachem showed major discrepancies even though no maintenance or other notification was recorded.  Detherage reported his findings to Meacham and Weber in emails dated October 3 and 4, 2005.  Plaintiff denies any discussions with Detherage, and characterizes Detherages' statement as "an absolute fabrication."  Plaintiff admits that he was supposed to record analyzer data correctly.

---

[31]Although defendant does not provide a definition of "Anachem," the Court surmises that it is a type of chemical analysis instrumentation and/or system involved in water purification.

When questioned by Weber and Smith about the analyzers on October 5, 2005, plaintiff responded by stating that he believed the analyzers were functioning properly and had flow. Plaintiff also indicated that he had not received any analyzer training and suggested if there were problems, it was due to his lack of training.

On October 12, 2005, Weber submitted a memorandum to Holmes documenting the October 3, 2005 incident with plaintiff that "illustrates [his] concern" set forth in his September 28, 2005 memorandum recommending plaintiff's termination.  Weber states that based on plaintiff's evasive responses during an interview with Weber and Smith on October 5, 2005, it was apparent to Weber that he lied about the flow through the analyzers.  Weber stated that plaintiff also indicated that he had not worked on the analyzers in months and that he never received training from Meacham on data entry for the logs.  Weber stated that Meacham told him plaintiff received training from Meacham, Mike Henderson and Detherage and had demonstrated that he could perform the data entry to Meacham.  Weber stated that Meacham and Mike Ramsey, who was present in the control room on October 3, 2005, were also interviewed by him and Smith and told him that plaintiff only took 45 minutes to an hour to perform all the analyzer checks on October 5, 2005, which should have taken at least two hours.  It was apparent to Weber that plaintiff did not check some analyzers or did not perform the checks properly. Weber concluded that this incident "is an example of how [plaintiff's] lies and dereliction of duty affects water treatment and our customers," reinforced Weber's concern that plaintiff's behavior will result in a violation of regulations or worse.

Schrempp subsequently prepared a memorandum to Holmes attaching Weber's October 12, 2005 memorandum and expressing Shrempp's concerns about the October 3, 2005 incident.

24

Although this memorandum is dated October 10, 2005, Schrempp explains that he finished it on October 11, 2005 and the date was automatically generated by his computer.  Schrempp does not explain, however, the date discrepancy regarding Weber's memorandum, which he states is attached to his memorandum, and which was seemingly prepared after Schrempp's memorandum.

In a memorandum to Arner, Schrempp and Weber dated November 2, 2005, Holmes laid out his case against termination of plaintiff in favor of a one year probation period and possibly a disciplinary suspension.  Holmes stated that "to go back and discipline an employee for incidents that occurred in June, July and August of this year is not timely or effective corrective action." Holmes summarized the three incidents as documented in Weber's September 28, 2005 memorandum and Schrempp's October 10, 2005 memorandum.  Holmes stated that he thought the first two incidents would not merit more than a verbal or written warning, but the third incident involving the turbidity meter merited "suitable" disciplinary action.  Holmes also commented that he believed WaterOne could be accused of retaliation against plaintiff.  Holmes did not mention the October 3, 2005 incident or Weber's memorandum to him dated October 12, 2005.

Subsequently, in a memorandum to Arner, Shrempp, Weber and Porter dated November 14, 2005, Holmes recounts a meeting with him, Schrempp, Weber and Porter on November 5, 2005, to discuss the reasons for his November 2, 2005 recommendation.  The meeting ended with Holmes asking Schrempp and Weber to consider probation for one year as an alternative to terminating plaintiff.  They agreed to think it over for the weekend, When the meeting reconvened on November 8, 2005, Schrempp and Weber indicated that they had discussed

Holmes' request to consider probation, but wanted to proceed with the recommendation to terminate plaintiff's employment.  Holmes states that Schrempp indicated he was concerned about a violation of the Kansas Statutes related to certification of operators of water supply systems and wastewater treatment facilities, and the penalties for making false statement, representation or certification.[32]  Holmes stated that when he asked if plaintiff had violated the statute, they said it did not appear that he had.  It was unclear to Holmes whether a violation had occurred, and he was cautious to use terms in the statute such as "fraud" or "deception" as a reason for termination.  He stated that he believed that Schrempp, Weber, Smith and Meacham did not trust plaintiff and the strongest position WaterOne could take would be to place plaintiff on probation for one year and require their Team Leader/Supervisor to document their performance on a monthly basis.  Holmes also stated that he believed that this option would eliminate any concerns for a retaliation charge.

Then, on December 2, 2005, Holmes sent a memorandum to Armstrong as a follow-up to his two previous memoranda regarding plaintiff.  In this memorandum, Holmes states that he had changed his mind about the recommendation to terminate plaintiff's employment as the October 3, 2005 incident with plaintiff had recently been brought to his attention in the form of Weber's October 12, 2005 memorandum.  Holmes stated that his previous recommendation of probation was based on the three incidents documented in Schrempp's memorandum of October 10, 2005, and not the October 3, 2005 incident.  Holmes stated, "Based on the seriousness of this incident and the potential impact on the quality of water being produced along with [plaintiff's] actions of July 19, 2005, concerning the Missouri Raw River turbidity meter, I do not believe it would be in

---

[32]K.S.A. §§ 65-4507, 65-170c.

[WaterOne's] best interest to retain this employee.  Consequently, I support the recommendation to terminate [plaintiff's] employment.

On December 8, 2005, Holmes, Schrempp and Smith met with plaintiff and advised that his employment was being terminated on December 21, 2005 and that he would be placed on paid suspension until that date.  They provided him with a letter that stated, in relevant part:

> . . . Your performance on October 3, 2005, concerning your operation of the chemical analyzer along with your actions of July 19, 2005, concerning the cleaning of the Missouri Raw River turbidity meter were unsatisfactory.
>
> Recently, you have demonstrated a pattern of unwillingness to follow well established procedures that Management feels are critical to the production of safe drinking water.  Therefore, as a result of your actions, Management has lost confidence in your commitment to produce safe drinking water.

Prior to his termination, plaintiff never received a written warning, discipline or safety citation for any of the incidents discussed above.

## IV.    Discussion

Plaintiff has abandoned his claim of age discrimination.   Accordingly, the Court will focus its analysis on plaintiff's Title VII claims of hostile work environment and retaliation.

### A.    Hostile Work Environment

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."[33]  This statutory provision prohibits subjecting an employee to a hostile

---

[33]42 U.S.C. § 2000e-2(a)(1).

work environment.[34]  "To establish a sexually hostile work environment existed, a plaintiff must prove the following elements: (1) [he] is a member of a protected group; (2) [he] was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment."[35]  WaterOne argues that it is entitled to summary judgment on this claim because (1) the alleged harassment was not based on sex; (2) the alleged harassment was not sufficiently severe or pervasive to constitute a hostile working environment; and (3) it has conclusively established a *Faragher* defense.

### Based on Sex

In *Oncale v. Sundowner Offshore Servs., Inc.*,[36] the Supreme Court held that both opposite-sex and same-sex sexual harassment is actionable under Title VII, but that such harassment violates Title VII only when it is "because of sex."  The term "sex" under Title VII refers to a class delineated by gender.[37]  Thus, even for same-sex sexual harassment claims, "[i]f the nature of an employer's environment, however unpleasant, is not due to [his] gender, [he] has not been the victim of sex discrimination as a result of that environment."[38]  Workplace harassment is not "automatically discrimination because of sex merely because the words used

---

[34]*Dick v. Phone Directories Co.*, 397 F.3d 1256, 1262 (10th Cir. 2006) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).

[35]*Id*. at 1262-63 (quoting *Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 797, 798 (10th Cir. 1997)).

[36]523 U.S. 75, 79-80 (1998).

[37]*Dick*, 397 F.3d at 1263 (citing *Taken v. Okla. Corp. Comm'n*, 125 F.3d 1366, 1369 (10th Cir. 1997)).

[38]*Id*. (quoting *Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir. 1994)).

have sexual content or connotations."[39]  Title VII is not "a general civility code for the American workplace."[40]  Instead, the critical issue in determining whether harassment is because of sex is whether members of one sex are subjected to a disadvantage to which the other sex is not.[41]

The *Oncale* Court established three ways a plaintiff can establish same sex harassment: (1) if the harasser was homosexual and motivated by sexual desire; (2) if the harassment was motivated by a general hostility to the presence of a particular gender in the workplace; and (3) if the harasser treated men and women differently in the workplace.[42]  In this case, plaintiff contends that "Meacham's sexual and homosexual comments were never made to females or in a female presence.  He treated women differently than men.  The statements he made sexually were only to men and not women."  Plaintiff also offers the affidavit of his co-employee Duckett, who also complained of "lewd" comments from Meacham.  WaterOne disputes this assertion as conclusory and self-serving.  The record, however, contains no evidence that Meacham made offensive comments to or in the presence of female employees.  The Court cannot conclude as a matter of law that Meacham's comments had nothing to do with gender.[43]

### Severe or Pervasive Conduct

Defendant contends that no reasonable jury could conclude that plaintiff's work atmosphere was sufficiently severe or pervasive to constitute a hostile working environment.  To

---

[39]*Id*. (quoting *Oncale*, 523 U.S. at 80).

[40]*Id*.

[41]*Id*.

[42]*Id*. (citing *Oncale*, 523 U.S. at 80-81).

[43]*See Jones v. Wichita State Univ.*, 528 F. Supp. 2d 1222, 1239 (D. Kan. 2007) (citing *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1263 (10th Cir. 1998)).

survive summary judgment, plaintiff must show that a rational jury could find that his workplace was permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment.[44]   The court determines the existence of such an environment by looking at the totality of the circumstances in the workplace, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[45]   The court evaluates these factors from both a subjective and an objective viewpoint.[46]   The court considers not only the effect that the discriminatory conduct actually had on plaintiff, but also the impact it would likely have had on a reasonable employee in plaintiff's position.[47]

In requiring a showing of a workplace permeated by severe or pervasive discriminatory conduct, the Supreme Court struck a balance between two extremes, creating "a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury."[48]   In so doing, the Supreme Court excluded from actionable conduct that which is "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," because Title VII was not meant to be a "general civility code."[49]   "'[S]imple teasing,' . . . offhand comments, and isolated

---

[44]*Id.* (citing *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998)).

[45]*Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

[46]*Id.* (citing *Harris*, 510 U.S. at 21).

[47]*Id.* (citing *Davis*, 142 F.3d at 1341).

[48]*Harris,* 510 U.S. at 21.

[49]*Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (citations omitted).

incidents (<u>unless extremely serious</u>) will not amount to discriminatory changes in the 'terms and conditions of employment.'"[50]  On the other hand, conduct need not be so severe or pervasive that it seriously affects a plaintiff's psychological well-being.[51]

The determination of whether a hostile environment existed "is not, and by its nature cannot be, a mathematically precise test."[52]  The consideration of the totality of the circumstances is warranted, "because the very term 'environment' indicates that allegedly discriminatory incidents should not be examined in isolation," but should be examined in the context in which they occurred.[53]

The Court finds that the record does not demonstrate a genuine issue of material fact with respect to plaintiff's hostile work environment claim.  Plaintiff has not shown that the alleged conduct was severe or pervasive such that it created an abusive work environment.[54]  Construed in a light most favorable to plaintiff, the evidence is that over a two month period, Meacham made three comments of a sexual nature that were offensive to plaintiff.  The incidents, taken as a whole, do not show a pervasive use of gender-based discrimination such that the conduct would unreasonably interfere with plaintiff's work environment.  The incidents were not physically threatening or humiliating, occurred infrequently, and were not severe.  Indeed, while

---

[50]*Id.* (citation omitted and emphasis added).

[51]*Nieto v. Kapoor*, 268 F.3d 1208, 1219 (10th Cir. 2001) (citation omitted).

[52]*Id.* at 1220 (citation omitted).

[53]*McCowan v. All Star Maint., Inc.* 273 F.3d 917, 925  (10th Cir. 2001) (citations omitted).

[54]The Court recognizes that "the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is 'quintessentially a question of fact.'" *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999).  When a plaintiff makes allegations that could not constitute a severe and hostile work environment even if believed by a jury, however, the court may enter summary judgment against the plaintiff.

Meacham's comments can certainly be construed as offensive, the environment taken as a whole in no way reflects a hostile work environment under the statutory standards. There were clearly incidents of sarcasm, ridicule and offensive utterance, but nothing took place that was so humiliating as to be abusive. While there is no dispute plaintiff found the incidents offensive, there is no evidence that the incidents unreasonably interfered with plaintiff's work performance. Thus, the Court concludes that a reasonable jury could not find that there was an abusive work environment under the law governing Title VII cases.[55] WaterOne is therefore entitled to summary judgment on plaintiff's claim of sexual harassment.[56]

## B.    Retaliation

Title VII makes it unlawful to retaliate against an employee because the employee has opposed any practice made unlawful by Title VII, or because the employee has "participated . . . in an investigation, proceeding or hearing."[57] In the absence of direct evidence of retaliation, the court assesses claims under the *McDonnell Douglas* burden-shifting framework.[58] Under this burden-shifting structure, plaintiff must first establish a prima facie case of retaliation. If she

---

[55]Plaintiff refers to a complaint he made regarding an alleged incident of harassment that occurred in 1998. Meacham was not the subject of that complaint, however, and the record does not show any further incidents or complaints of inappropriate conduct until plaintiff's August 23, 2005 complaint. In addition, plaintiff may not rely on prior acts of alleged discrimination occurring outside the charging period, as these constitute discrete and time-barred actions. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002).

[56]Because plaintiff cannot establish a prima facie case of sexual harassment, the Court need not address WaterOne's argument that it has established the affirmative defense set out in *Faragher*, 524 U.S. at 775. The Court notes, however, that while WaterOne presents facts in support of the first element, that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, it failed to address the second element, that plaintiff unreasonably failed to take advantage of any corrective or preventive opportunities. *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998).

[57]42 U.S.C. § 2000e-3(a).

[58]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Medina v. Income Support Div.*, 413 F.3d 1131, 1135 (10th Cir. 2005).

does so, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment decision.  From there, the burden returns to plaintiff to show that the stated reason is pretextual.[59]

### Prima Facie Case

The elements of a prima facie claim of retaliation under Title VII are: (1) the employee engaged in protected opposition to discrimination; (2) the employee suffered an adverse employment action during or after his protected opposition that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action.[60]  "Once the employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action.  If the employer does so, the burden shifts back to the plaintiff to show that the employer's reasons are pretextual."[61]  WaterOne argues that plaintiff cannot establish the first and third elements because plaintiff's complaints were made in bad faith and no causal connection exists between his termination and his complaint of harassment.

### Protected Action

To engage in protected opposition to discrimination, plaintiff must have a reasonable good faith belief that he was opposing discrimination.[62]  A plaintiff's opposition could be

---

[59]*Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).

[60]*McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006).

[61]*Id.* (citations omitted).

[62]*Crumpacker v. Kan. Dept. of Human Res.*, 338 F.3d 1163 (10th Cir.2003), *cert. denied*, 540 U.S. 1180 (2004).

protected, however, even if he was wrong about whether the alleged conduct in fact violated Title VII; it is enough if plaintiff had a good faith belief that Title VII had been violated.[63] WaterOne argues that plaintiff acted in bad faith when he accused Meacham of harassment on August 23, 2005, the day after the meeting with plaintiff to discuss his poor performance.  Given that Meacham admitted to the incidents plaintiff alleged as harassment, and Yoder's conclusion that the comments were inappropriate, the Court finds that plaintiff has demonstrated this element of his prima facie case, notwithstanding the Court's previous ruling that the conduct was not sufficiently severe or pervasive to withstand summary judgment.  Any further questions regarding plaintiff's motivation for filing the complaint is for the jury to decide.

*Causation*

To establish a causal connection exists between plaintiff's complaint and termination of his employment, plaintiff must proffer "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."[64]  "However, unless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation."[65]

Plaintiff filed his complaint on August 23, 2005, and received notice that his job would be terminated over three months later on December 8, 2005.  In the Tenth Circuit, three months

---

[63]*Id*. at 1172 (citing *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 385 (10th Cir. 1984)).

[64]*Proctor v. U.P.S.*, 502 F.3d 1200, 1208 (10th Cir. 2007) (quotation omitted).

[65]*Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)) (emphasis in the original) (internal citations omitted).

is too large a time gap to establish a causal connection.[66]  Accordingly, plaintiff must present additional evidence to establish the necessary causal connection.[67]

The evidence plaintiff proffers in support of causation is evidence he claims demonstrates the weakness of WaterOne's proffered reason for elimination of his job, thereby creating a genuine issue of material fact as to whether WaterOne's reason is a pretext for retaliation. Although this kind of evidence is typically considered during the third phase of the *McDonnell Douglas* inquiry, the Tenth Circuit has considered evidence of pretext in the prima facie stage of a retaliation claim.[68]

### *Legitimate Reason for Termination*

WaterOne asserts that it terminated plaintiff due to the October 3, 2005 incident involving the chemical analyzers and the July 19, 2005 incident involving the turbidity meter. WaterOne further asserts that it discharged plaintiff because he had demonstrated a pattern of unwillingness to follow well established procedures and as a result, management lost confidence in his commitment to perform his job.  The Court finds that defendant has articulated a legitimate, nonretaliatory reason for terminating plaintiff's employment.

---

[66]*Id.* (noting that Tenth Circuit has found a proximity of three months insufficient to support "a presumption of causation"); *Proctor*, 502 F.3d at 1208 (finding four months too large a gap).  Plaintiff argues that Weber's initial recommendation to terminate plaintiff appears in a memorandum dated September 28, 2005, approximately one month after plaintiff filed his complaint.  Plaintiff is correct that in *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405-2414-15 (2006), the Supreme Court relaxed the definition of adverse employment action to include an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  The Court does not read this definition of adverse employment action to extend to a mere recommendation of termination or other discipline, until that recommendation is actually acted upon and approved, and plaintiff cites no to suggest authority otherwise.

[67]*Piercy*, 480 F.3d at 1198-99 ("[T]he passage of time does not necessarily bar a plaintiff's retaliation claim if additional evidence establishes the retaliatory motive.").

[68]*Proctor*, 502 F.3d at 1209 (citing *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir. 2003) (considering evidence of pretext in analyzing the causation element of a prima facie case of retaliation under Title VII)).

*Pretext*

To defeat summary judgment, plaintiff must show that there is a genuine dispute of material fact as to whether defendant's explanations for terminating her employment are pretextual.[69]  To raise a fact issue of pretext, plaintiff must present evidence of temporal proximity plus circumstantial evidence of retaliatory motive.[70]  A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[71]  While this burden is not onerous . . . it is also not empty or perfunctory."[72]  A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action was false, *i.e.* unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff.[73]

Plaintiff offers many examples of what he characterizes as evidence of pretext, including claims of fabrication and failure to follow company policy.  While many of plaintiff's arguments are mere conjecture not supported by the record, WaterOne's record also has several notable shortcomings and omissions.  Although it is a close question, the Court finds that two of

[69]*Id.* (citing *Mickelson v. New York Life Ins. Co.* 460 F.3d 1304, 1318 (10th Cir. 2006)).

[70]*Id.* (citing *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206-07 (10th Cir. 2000)).

[71]*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

[72]*Id.* at 1323-24.

[73]*Kendrick v. Penske Transp. Servs, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

plaintiff's assertions, coupled with the temporal proximity of his termination, are sufficient to raise a fact issue of pretext.

First, plaintiff asserts that the turbidity meter incident was fabricated by Meacham in order to have plaintiff terminated.  Plaintiff claims that Meacham made up the incident after he filed his harassment claim against Meacham, and that he first learned he was assigned to read the turbidity meter at the August 22, 2005 meeting.  The record indicates, however, that Meacham reported all three incidents, including the turbidity meter incident, prior to August 23, 2005, and that WaterOne had counseled and was investigating plaintiff as of August 22, 2005, when he had the meeting with Weber and Smith.  On the other hand, whether and to what extent plaintiff was assigned the Missouri River turbidity meter reading is far from clear.  The record contains no evidence or documentation to verify Meacham's claim that he assigned plaintiff this job in late March 2005, which plaintiff denies.  Nor does WaterOne address plaintiff's claim that other employees were also responsible for checking the Missouri River intake, other than to state it was plaintiff's responsibility on Mondays and Thursdays.  Finally, as previously discussed in the context of plaintiff's motion to strike, WaterOne has not offered evidence of the card key documentation referred to in Weber's affidavits to support its assertion that plaintiff was not checking the turbidity meter as assigned.

Second, plaintiff cites as evidence of pretext Holmes' change of heart regarding his termination.  Holmes states in his December 2, 2005 memorandum that the October 3, 2005 incident was brought to his attention after his memos of November 2, and 14, 2005.  As plaintiff points out, at the time Holmes' prepared the November 2005 memos in which he strongly advocates against plaintiff's termination, he had been provided both of the memos prepared by

37

Shrempp and Weber on October 10 and 12, 2005, respectively, which documented in detail the allegations of the October 3, 2005 incident.  Holmes failed to mention the October 3, 2005 incident in either of his November 2005 memos, despite the fact that he had several meetings with Schrempp and Weber to discuss plaintiff's situation.  Plaintiff asserts that WaterOne cannot reasonably suggest that Holmes had any new information in December that he did not have in November 2005, and that his change of position is evidence of pretext.  The Court agrees that it is implausible that seemingly no mention of the October 3, 2005 incident was made in the meetings with Holmes, Schrempp and Weber, especially in light of Schrempp and Weber's memos citing the seriousness of that incident.  WaterOne does not offer any explanation for this apparent omission, other than to state that regardless of when he received Weber's October 12, 2005 memorandum, Holmes did not review it until after his November 14, 2005 memorandum.  WaterOne does not submit any explanation by way of an affidavit from Holmes or the other decision makers regarding his failure to factor in the October 3, 2005 incident when making his recommendation, and the apparent failure to discuss what Weber and Schrempp characterize as a serious incident justifying plaintiff's termination.  Moreover, as previously discussed, WaterOne failed to produce and has withdrawn from consideration, Schrempp's November 10, 2005 memorandum addressing plaintiff's termination, which may or may not cast further light on this issue.  Accordingly, summary judgment on plaintiff's retaliation claim is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that plaintiff's Motion to Strike and Compel Documents (Doc. 30) is DENIED;

**IT IS FURTHER ORDERED** that defendant's Motion for Summary Judgment (Doc. 19) is GRANTED with respect to plaintiff's age discrimination and hostile work environment

38

claims, and DENIED with respect to his retaliation claim.

**IT IS SO ORDERED.**

Dated this 19th day of May 2008.

 S/   Julie A. Robinson
Julie A. Robinson
United States District Judge